UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LYNN F. KLINE, | ) | CASE NO. 5:12CV1169 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | **ORDER AND DECISION** |
| PORTAGE COUNTY BOARD | ) | |
| OF COMMISSIONERS, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on Defendant Portage County Board of Commissioner's ("Defendant") motion for summary judgment (Doc. 37).

## I.  Introduction

Plaintiff Lynn Kline ("Kline") worked for Defendant from April 2002 until May 2011. During her employment with Defendant she worked as an accounting specialist in the Water Resources Department ("Water Resources") until her promotion within Water Resources to accounting supervisor in 2005.  At all times relevant to this matter, Kline maintained a license as a certified public accountant. In 2010 Plaintiff was asked to assist in the Solid Waste Management District ("Solid Waste"), another department with Defendant. While assisting at Solid Waste, Kline discovered a file drawer with cash and checks that had not been deposited. She reported the found payments to Bill Steiner, the director of Solid Waste and Harold Huff her supervisor at Water Resources. Kline and others then attempted to match the found payments with their invoices and customer accounts. Due to the time it took to clean up the backlog of deposits at Solid Waste, Kline recommended that Defendant merge the Solid Waste accounting department with the accounting department at Water Resources.

1

Defendant later abolished the accounting departments of both Solid Waste and Water Resources and formed a new accounting department under the control of the Department of Budget and Finance ("Budget and Finance").  The merger of the two departments under Budget and Finance eliminated Kline's position along with several others.  Kline then interviewed for a position within the new department but was not selected for rehire.

## II.  Procedural History

In April 2012, Kline brought suit against Defendant in the Portage County Court of Common Pleas alleging state law claims under Ohio Revised Code Chapter 4112 for discrimination, unequal pay, sexual harassment and retaliation and a claim under 42 U.S.C. § 1983 for violation of her First Amendment rights. Doc. 1-1.  Defendant removed the matter to the United States District Court for the Northern District of Ohio. Doc. 1. In March 2013, Defendant moved for judgment in its favor on each of Kline's claims. Doc. 37.  Kline timely opposed the motion and elected only to pursue her claims for wage discrimination under O.R.C. 4112 and retaliation in violation of her First Amendment right to protected speech and petition. Doc. 48 at 4-5.  Kline voluntarily withdrew her O.R.C. 4112 claim for retaliation and abandoned the remainder of her claims. Id.  Defendant filed a reply in support of its motion. Doc. 49.

## III. Standard of Review

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *White v. Turfway Park Racing Ass'n.*, 909 F.2d 941, 943-44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable

2

evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id*. at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## IV. Public Employment and First Amendment Retaliation

### A.  FACTS

Kline alleges that Defendant eliminated her position as account supervisor in Water Resources and refused to rehire her for the newly created position because she had criticized and objected to "financial improprieties" allegedly committed by Defendant. Doc. 48 at 5. Kline appears to argue that Defendant retaliated against her both by firing her and by not rehiring her. Although the elements she must prove differ depending on the type of retaliation at issue, it does not change this Court's analysis below. In her brief and during her deposition Kline discusses several of her concerns regarding the handling of funds at both Solid Waste and Water Resources that she believes led Defendant to eliminate her position and refuse to hire her for the new department.  Those concerns were: (1) The handling of accounts after receipt of bankruptcy notice; (2) Engineers ignoring her budget constraints; (3) Refusal to hide inspection reports from state auditor; (4) The Brady Lake Plant; (5) Refusal to credit $20,000 to a seven year old account; (6) Unposted checks and cash found in file drawer at Solid Waste and Defendant's refusal to conduct a fraud audit; and (7) Combining the independent accounting departments of Water Resources and Solid Waste under the generally funded Budget and Finance.

3

<u>Bankruptcy Accounts</u>

In 2007 or 2008, Kline was concerned about the way Huff instructed her to handle the account of a customer who had filed bankruptcy. She believed that upon receiving a customer's notice of bankruptcy, the account balance for the customer needed to be written off. When she spoke with Huff about writing off the balance, he instructed her not to do so. She then sought out the internal auditor and was told to write off the balance. The internal auditor allegedly also spoke with the state auditor and prosecutor[1] who both agreed that the balance needed to be written off. When Kline approached Huff again, he again instructed her not to write the balance off. Kline then sent a letter to Huff presumably to receive his instruction in writing.  Instead, Huff instructed her to write off the balance. From that point on, when they received bankruptcy notices for an account with a remaining balance, Kline wrote the balances off. Previous accounts were not adjusted. Doc. 43 at 14-15.

<u>Garage Mahal</u>

Kline described a situation when the engineers went far beyond her approved budget and lied to the commissioners regarding funding.  Specifically, the engineers requested that she approve a budget of $200,000 for a garage. Kline approved the $200,000 funding for the garage to be built in 2013, but eleven months after she relayed this, the engineer informed her that the project was over budget and, at that point, had cost $2.7 million. According to Kline, when the engineer took the funding issue to Defendant, the engineer told them that $200,000 of the funding would be coming from approved grant applications. Kline later informed one of the commissioners that the grants had not, in fact, been approved. Kline states that her budgeting

---

[1] Kline's brief incorrectly states that she complained "to internal government management and external government agencies including the Portage County Prosecutor's office and the State of Ohio Auditor." Doc. 48 at 13. Upon review of Kline's deposition, the record shows that Kline testified that she met with her internal auditor and the internal auditor then spoke with the state auditor and prosecutor regarding Kline's concern.

skills were questioned by Budget and Finance because the engineers built "the Garage Mahal." Doc. 43 at 17 and 18.

Refusal to Hide Inspection Reports

Kline states that she was told to lie to an auditor by stating that certain internal inspection reports had been lost. According to Kline, the department had received a federal grant to build a sewer plant. One of the grant's conditions was that a specifically named inspector would not be allowed to perform the inspections because the inspector's family had been contracted to perform the work on the project. Ignoring that condition, that inspector performed all of the inspections. Whenever the auditor came around, Huff ordered Kline to hide the inspection reports. Kline refused to hide the reports stating that doing so could cause her to lose her CPA. Doc. 43 at 122-123.

Brady Lake Plant

Prior to Kline's employment with Defendant, the department received a federal grant to build a water plant at Brady Lake. After building the plant, the department never used it, took the equipment out of the plant for use in other plants, and then allowed the parks department to use the building for storage. According to Kline, whenever "a guy" would come to check on the plant, the engineers would distract him by taking him to lunch or taking him to other plants so that he wouldn't find out that the Brady Lake Plant was not operational. Doc. 43 at 123 -125.

Refusal to Credit a 7 year old Account

Kline claims that she was asked to alter seven year old time sheets in order to credit a developer for $20,000 worth of work that Water Resources performed. When Kline refused to alter the time sheets, Huff went to the Defendant about the issue, and Defendant authorized the credit. Kline believes that her refusal to alter the time sheets, essentially by writing off $20,000

of accounts receivable for the department, played a role in Defendant's decision not to rehire her when it abolished her position.  Doc. 43 at 125-128.

Solid Waste Department

In May 2010, the accounting supervisor at the Solid Waste resigned her position. Defendant asked Plaintiff to assist at Solid Waste with its accounting needs.  Doc. 43 at 47-48. While assisting at the Solid Waste, Kline asked Bill Steiner, the Director, about the District's falling revenue. Doc. 43 at 53. Another employee of Solid Waste then directed Kline to a locked filing cabinet containing unposted and undeposited checks and cash. Doc. 43 at 50-51. Kline and Steiner contacted the Defendant Commissioners regarding the unposted payments. Doc. at 54-55.

One of the commissioners, Maureen Frederick, confirmed with the County Treasurer's Office that the pay-ins at Solid Waste were not being deposited with the Treasurer's Office in a timely manner. At Frederick's request, Kline began reconciling the found cash and checks and deposited the money with the Treasurer's Office.

In addition to the found cash and checks, Kline discovered tha the department was missing some payments that had been sent in.  The procedure at Solid Waste for when it received a payment check was to photocopy the check upon receipt. Doc. 43 at 59. Kline discovered that there were three checks that had been photocopied but were not located in the drawer. Doc. 43 at 59.  Those three checks were not found. Doc. 43 at 59.  In addition, there were some checks in the drawer which Kline was unable to match to any specific customer account. Doc. 43 at 56. These checks were processed and held in trust in the event that a client called regarding the failure to credit its account. Doc. 43 at 56.

Kline alleges that she was told to keep this situation quiet. Doc. 43 at 71.  She requested that Defendant conduct a fraud audit of Solid Waste to look into the mismanagement of the

finances. Doc. 43 at 59-60.  According to Kline, Defendant refused to conduct the fraud audit and, instead hired an outside accountant to do a performance review.  Doc. 43 at 61-62. Kline states that the review did not include looking for the missing deposits or any type of investigation of fraud in Solid Waste. Doc. 43 at 63.  Kline acknowledges that she has no basis for believing that the three missing checks were part of fraudulent activity. Doc. 43 at 66.

<u>Restructuring of the Accounting Departments</u>

Prior to 2011, Portage County was structured such that the Office of Budget and Financial Management oversaw the departments which utilized the County's general fund. Water Resources and Solid Waste were funded by user fees and not the County's general fund and, as such, were responsible for their own accounting functions.  Defendant was liable for the accounting functions of Water Resources and Solid Waste even though they were not overseen by Budget and Finance.  Defendant claims that Commissioner Frederick had considered a merger of the two departments around 2003 or 2004 to reduce the potential liability exposure for the Commissioners.  While assisting at Solid Waste, Kline discussed with Frederick merging the two accounting departments of Water Resources and Solid Waste. Doc. 43 at 80.  Kline suggested that the departments be consolidated under Water Resources, but thought that it might be possible to merge them under one of Defendant's other departments "if it was done right." Doc. 43 at 81.

In 2011, Defendant formed a small group, consisting of Kline, the Director of Budget and Financial Management Audrey Tillis, the Water Resources Director Jeff Lonzrick[2], the Solid Waste Management District Director Bill Steiner, and the Director of Human Resources Karen

---

[2] Harold Huff left his employment with Defendant at the end of 2010. Jeff Lonzrick became acting Director of Water Resources. Doc. 43 at 84.

U'Halie, to review the various accounting functions and present options as to how those functions could be consolidated. Doc. 43 at 83.

The group met and several ideas were proposed for how to best present the merger to the Defendant. Doc. 43 at 84. Tillis then approached Kline and discussed consolidating the two accounting departments under Budget and Finance. Tillis also asked Kline to be her "assistant director" at Budget and Finance. Doc. 43 at 88-89. Having read some articles on the Government Financial Officers Association's website about the dangers of consolidating departments under budget and finance departments, Kline believed that the funds from Water Resources and Solid Waste should not be consolidated under Budget and Finance. Doc. 43 at 89. Kline objected to the merger of the two independent accounting departments under Budget and Finance and declined Tillis's offer to be her assistant director. Doc. 43 at 84. Kline had no more involvement in the discussions of the merger group. Doc. 43 at 89.

After reviewing the various proposals from the merger group, the Defendant consolidated the accounting departments of Water Resources and Solid Waste into a new department under Budget and Finance. Doc. 43 at 93 and 94. As a result of the merger, two full-time accountant and budget analyst positions, one full-time data and budget entry clerk position and two part-time data and budget entry clerk positions were created in the Office of Budget and Financial Management under Director Audrey Tillis. Doc. 48-7 at ¶7.

The full-time position of Accounting Supervisor, the full-time position of Accounting Specialist III and three full-time positions of Accounting Specialist I were abolished at Water Resources. Doc. 48-7 at ¶4. The full-time positions of Environmental Programs Coordinator, Special Projects Coordinator and Accounting Supervisor at Solid Waste were likewise abolished. Doc. 48-7 at ¶4.

Kline's position as accounting supervisor in Water Resources was one of the positions abolished by the merger. She interviewed with Audrey Tillis, Karen U'Halie, and JoAnn Townend for the position as a budget analyst accountant in the new department set up under Budget and Finance. Doc. 43 at 111. The position Kline interviewed for was not a supervisory position. Doc. 43 at 115. During her interview, Kline inquired as to what process would be followed under the new system that would ensure that the funds from Water Resources and Solid Waste would be kept separate from the general fund of Budget and Finance. Doc. 43 at 114. Kline informed the interviewers that she "would not do anything illegal" to get, or keep, her job. Doc. 43 at 114. Audrey Tillis had the final authority for hiring; she did not select Kline for the position. Doc. 43 at 112. The position was later filled by one of the persons Kline had previously supervised at Water Resources. Doc. 43 at 111.

### B. LAW AND ANALYSIS

"It is well-established that the federal government has a greater ability to curtail the free-speech rights of its employees than the public generally—though that ability is not boundless." *Housey v. Macomb County*, 534 Fed.Appx. 316, 320 (6th Cir. 2013). The Sixth Circuit has set forth the following burden shifting framework for reviewing First Amendment Retaliation claims:

> A plaintiff must first make a prima facie case of retaliation, which comprises the following elements: (1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by his protected conduct. If the employee establishes a prima facie case, the burden then shifts to the employer to demonstrate by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct. Once this shift has occurred, summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant. Unlike in the *McDonnell Douglas* burden-shifting framework, the

9

burden does not shift back to a plaintiff to show pretext in First Amendment retaliation claims.

*Dye v. Office of the Racing Com'n*, 702 F.3d 286, 294-295 (6th Cir. 2012) (internal citations and quotation marks omitted).

Accordingly, this Court must answer three questions when deciding whether Kline's claim under the First Amendment survives summary judgment: (1) Did Kline engage in constitutionally protected speech? (2) Was she then subjected to some adverse action by her employer that would discourage a person of ordinary firmness from continuing to send such reports or make such communications? (3) Was the protected speech a motivating factor behind the adverse action(s)? *See, id.* at 320 *citing Evans–Marshall*, 624 F.3d at 337 and *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003).

### 1. Did Kline engage in protected speech?

Whether a public employee's speech is constitutionally protected is a question of law. *Dixon v. University of Toledo*, 702 F.3d 269, 274 (6th Cir. 2012). "The Supreme Court has devised a three-part framework to define the contours of the free-speech rights of public employees[.]" *Housey*, 534 Fed.Appx. at 320-321. A public employee's speech is only protected when: "(1) it touches on a matter of public concern; (2) it is not uttered pursuant to the employee's official duties but rather as a citizen; and (3) the employee's interest in the speech outweighs the government's interest in promoting the effective and efficient fulfillment of its responsibilities to the public." *Id.* at 321 (internal citations and quotation marks omitted). "All three are necessary but not sufficient conditions. *Id.* (citation omitted).

Thus, as a public employee, to prove that she engaged in protected speech, Kline needs to show both that the content of her speech touched upon a matter of public concern and that she was speaking as a citizen (as opposed to as an employee pursuant to her official duties). *Keeling*

10

*v. Coffee County, Tenn.*, 541 Fed.Appx. 522, 526 (6th Cir. 2013) (*citing Borough of Duryea v. Guarnieri*, —— U.S. ——, 131 S.Ct. 2488, 2493, 180 L.Ed.2d 408 (2011)).  If both these elements are met, the Court must then apply the *Pickering* balancing test to determine if the employee's free speech interests outweigh the efficiency interests of the government as an employer. *See Housey*, 534 Fed.Appx. at 321-322 (relying on *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968)).

a.  Public Concern

In *Connick*, the Supreme Court held that a public employee's speech is only protected by the First Amendment when it addresses "a matter of public concern," which is to say speech that "relat[es] to any matter of political, social, or other concern to the community." 461 U.S. at 146. An "employee grievance concerning internal office policy," on the other hand, is the sort of speech not entitled to any special protection. *Id*. at 154. The Court further held that "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id*. at 147–48.  "Of these considerations, content is generally regarded as the most important." *Housey*, 534 Fed.Appx. at 321 (*citing Desrochers v. City of San Bernardino*, 572 F.3d 703, 710 (9th Cir. 2009)).

"[T]the fact that an issue involves public money is alone not enough to convert expressive activity into commentary on a matter of public concern." *Gragg v. Kentucky Cabinet for Workforce Development*, 289 F.3d 958, 966 (6th Cir. 2002) (*citing Rahn v. Drake Center, Inc.*, 31 F.3d 407, 412 (6th Cir. 1994)). "The mere fact that public monies and government efficiency are related to the subject of a public employee's speech do[es] not, by [itself], qualify that speech as being addressed to a matter of public concern." *Barnes v. McDowell*, 848 F.2d

11

725, 734 (6th Cir. 1988). "[S]tatements exposing possible corruption ... are exactly the type of statements that demand strong First Amendment protections." *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 543 (6th Cir. 2012) (citations omitted). Moreover, "public interest is near its zenith when ensuring that public organizations are being operated in accordance with the law, when exposing graft and corruption, and when seeing that public funds are not purloined or wasted." *Chappel v. Montgomery Cnty. Fire Prot. Dist. No. 1*, 131 F.3d 564, 576 (6th Cir. 1997) (alterations, citations, and internal quotation marks omitted).

The nature of each of Kline's concerns deals with either mismanagement of funds or customer accounts or alleged fraud by a governmental entity. For example, accepting Kline's recitation of the events as true, with respect to Huff's instruction to hide inspection reports from the auditor, there is an argument that her supervisor asked her to defraud the government. Likewise, the fact that a governmental entity received federal grant money for a project that was either never completed, or completed and not operational, could also be viewed as a matter of employer sanctioned fraud. Accordingly, the Court will assume for the sake of summary judgment, without formally deciding, that Kline's speech at issue involved matters of public concern.

b. Job Duty or Private Citizen?

Kline must also show that she was speaking as a citizen as opposed to as an employee pursuant to her official duties. *Keeling*, 541 Fed.Appx. at 526. If the employee's speech "owes its existence to an employee's professional responsibilities," the employee will not be entitled to First Amendment protections. *Id.* at 527. When reviewing whether a public employee spoke as a citizen, we must assess both the speech's "content and context—including to whom the statement was made—to determine whether the plaintiff made the statement pursuant to her

12

individual duties." *Fox v. Traverse City Area Public Schools Bd. of Educ.*, 605 F.3d 345, 348 (6th Cir. 2010). Raising complaints or concerns up the chain of command at the employee's workplace about job duties is speech undertaken in the course of performing the job. *Id.* (citation omitted). The Court must examine the "impetus for the speech, the setting of the speech, the speech's audience, and its general subject matter." *Handy–Clay*, 695 F.3d at 540 (internal quotation marks omitted). The Court also considers whether the speech is nothing more than a public employee complaint against a supervisor. *Id.* at 540–41. "The employee-or-citizen determination does not turn on whether one exposes the alleged wrongdoing of a superior or subordinate," the principal focus is on the employee's professional responsibilities. *Housey*, 534 Fed.Appx. at 322 (*citing Garcetti*, 547 U.S. at 421).

Kline describes her job duties to include budgeting, cost accounting projects, payroll, preparing financial reports, meeting with auditors, handling funds, and other duties as assigned. *Garcetti* did not provide guidelines for how an employee's job duties should be defined, but the Court stated that the "proper inquiry is a practical one." *Garcetti*, 547 U.S. at 424. In addition, the Court stated that whether the relevant speech is included in the employee's job description is "neither necessary nor sufficient" to establish that it was pursuant to the employee's official duties for First Amendment purposes. *Id.*

Each of Kline's complaints "owes its existence" to her responsibilities as the accounting supervisor at Water Resources. For example, Kline was aware of the bankruptcy write-off procedure because of her role as accounting supervisor. She knew that Water Resources didn't get the $200,000 grant money and that the engineers had exceeded their budged on the "Garage Mahal" because of her role as accounting supervisor. Similarly, as it was Kline's duty to meet with auditors when they came to Water Resources, she was told to hide the inspection reports

from the auditor.  Kline was aware of the Brady Lake Plant also because of her role in Water Resources.  Kline was approached to write off $20,000 from the seven year old account specifically because it was her job to credit accounts (or decline to do so).

Kline argues that reporting financial discrepancies in Solid Waste was not within her job description, and, therefore, it was outside of her official duties.  The fact that the words "reporting accounting problems" are absent from Kline's official job description does not show that she was acting outside of her official duties. *Garcetti*, 547 U.S. at 424. Looking at this practically, Kline was an accountant for Water Resources, and her employer asked her to help at another department.  While helping as an accountant and examining the income receipts, she discovered accounting problems and reported them to the department's director and to the Defendant County Commissioners. Even if Kline was trying to look out for the public interest, she was still an accountant reporting accounting errors within the scope of her employment.

Kline's conversation with Tillis regarding merging the accounting departments of Solid Waste and Water Resources under Budget and Finance is a closer call, but nonetheless, also fails.  Kline acknowledges that her day-to-day responsibilities included ensuring the use of sound accounting principles. In fact, Kline believed it was her duty as a CPA to make certain that she was involved in nothing that could jeopardize her license.  She took this responsibility very seriously, and believes that her refusal to "do anything illegal," consequently cost her her job.  This Court finds that Kline was, instead, performing her job duties as an accounting supervisor in the expected and professional manner.  For Kline to have failed to warn her employer of potential issues would have been a dereliction of her job duties.

Moreover, the forum Kline chose to air her complaints suggests that she believed it was part of her job duties to bring the "misconduct" to light.  Kline discussed the handling of the

14

bankrupt account write-offs with her immediate supervisor, Huff, and then with the internal auditor which eventually resulted in changing Huff's mind. She discussed her concerns about the overage with the "Garage Mahal" with one of the commissioners, but only after he brought it up while in her office to discuss another matter. The record is void of any mention that she ever followed up with anyone regarding the overages or that she aired her complaints to anyone outside of her workplace.  With respect to her refusal to lie to the auditor about the inspection reports, there is no evidence that Kline brought this complaint to anyone at all, nor did she expose the reports to the auditor or let him know of their existence. Similarly, the record demonstrates that Kline, in fact, played no part in hiding the Brady Lake Plant's inoperability from whomever it was that came around to look at it.  During her deposition, Kline admits that she didn't actually play a role in distracting the man when he came around.  The record is void of any indication that she spoke to anyone regarding her concern about the fact that the federal grant had been accepted and not properly used.  Kline's complaints regarding her refusal to credit $20,000 to a seven year old account were, likewise, made to her supervisor. Finally, Kline disclosed the financial discrepancies in Solid Waste and her concerns with combining the accounting departments under Budget and Finance with her direct supervisors and Audrey Tillis – the Director of Budget and Finance, respectively; these are the very people to whom Kline *should* have expressed her concerns.

There is no dispute that Kline consistently "[raised her] complaints or concerns up the chain of command at the employee's workplace," *Fox*, 605 F.3d at 348, and took them no further. While not conclusive, this fact is certainly persuasive.  As in *Housey*, "[i]t might have been a different case had [she] written a letter to [her] local newspaper or tipped off an independent state agency, but [she] did neither."  534 Fed.Appx. at 323.

This Court concludes that Kline's speech is not entitled to constitutional protection.  Her airing of her concerns arose out of her duty as an accounting supervisor to oversee efficient administration of the accounting department in Water Resources and, while assisting there, at Solid Waste.  The content of Kline's communications owe their existence to her duties as accounting supervisor and are not the type of communications engaged in by private citizens.  Accordingly, Kline's speech fails under the *Garcetti* employee-or-citizen test.  *See Id.*

> c.  <u>Balancing of the value of the protected speech with governments need to discipline for it.</u>

Considerations involved in the *Pickering* balancing test include "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Dye*, 702 F.3d at 295 (*citing Rankin v. McPherson*, 483 U.S. 378, 388 (1987).

Because this Court finds that Kline's speech was made in connection with her job duties, and not that of a private citizen, it need not perform the *Pickering* balance test.  *See Housey*, 534 Fed.Appx. at 322-323.

> **2.  Was Kline subjected to an adverse employment action that would discourage a person of ordinary firmness from continuing to engage is such communications?**

Kline lost her job and was not rehired into the new department. The Court finds that she was subject to an adverse employment action.

> **3.  Was the protected speech a motivating factor behind the adverse employment action?**

As discussed above, this Court determined that Kline spoke as an employee rather than a citizen. "That alone dooms [her] First Amendment retaliation claim regardless of [her] ability to

show that [she] spoke on a matter of public concern." *Housey*, 534 Fed.Appx. at 323.  Assuming for the sake of argument, however, that Kline has met the first two elements for her First Amendment claim, she must now show that her speech at least in part caused her job loss or was a motivating factor behind Defendant's decision not to rehire her.

In order to show that this speech was a substantial motivating factor, Kline must point to "specific, nonconclusory allegations' reasonably linking her speech to employer discipline." *Bailey v. Floyd County Board of Education*, 106 F.3d 135, 144 (6th Cir. 1997) (internal quotation and citation omitted). "Thus, when opposing a motion for summary judgment, the nonmoving party may not rely on the mere fact that an adverse employment action followed speech that the employer would have liked to prevent." *Id.*  Although causation is typically a question to be resolved by a jury, "[a] court may nevertheless grant summary judgment on the issue of causation when warranted."  *Id.*

To meet the causation burden, as noted in *Eckerman v. Tennessee Department of Safety*, 636 F.3d 202, 209 (6th Cir.2010), the employee must present:

> [E]nough evidence of a retaliatory motive such that a reasonable juror could conclude that [adverse employment action] would not have occurred but for his engagement in protected activity. A causal link can be shown through direct or circumstantial evidence, including showing temporal proximity between engaging in protected activity and suffering an adverse employment action that may create an inference of causation.

If the employee meets this initial burden, the burden then shifts to the employer to show by a preponderance of the evidence that it would have reached the same decision to terminate the employee even in the absence of the protected speech. *Id*. at 208. "[S]ummary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant." *Id*.

Here, Kline has presented no evidence to link either Kline's loss of job or Defendant's failure to rehire her with any protected speech or petition that she made.  Kline offers pages of facts to demonstrate "the kind of environment [she] worked in[,]" but never discusses the causation element of her First Amendment claim. See Doc. 48 at 13-26.

Even had Kline met her burden, Defendant demonstrates that the merger of the two accounting departments under Budget and Finance was not done in order to push Kline out of her job.  Defendant merged the accounting departments of both the Water Resources and Solid Waste accounting departments consolidated under Tillis in a third, independent department – the Department of Budget and Finance. Kline herself recommended the merger; she just disagreed with consolidating it under Budget and Finance.  As a result of the merger and reassignment, Kline's position, as well as the accounting position in Solid Waste, was abolished. The evidence is undisputed that the elimination of redundant accounting departments resulted in a financial savings for Defendant. Also, the fact that prior to the consolidation, but after the Kline reported the financial discrepancies, Tillis offered Kline a position as her assistant in Budget and Finance, shows that the abolishment of Kline's position and the decision not to rehire her was not due to her reporting the financial discrepancies.

Kline argues that Tillis did not recommend her to be re-hired because Kline opposed the consolidation of the accounting function under Tillis's control in the Department of Budget and Finance. (Doc. 43 at 101). Even if this argument were true, the failure to re-hire was not a decision made by the Defendant, and was not a decision that violated any law. It is not sufficient that an adverse action followed the speech, rather, there must be a specific link between the speech and the decision to dismiss the employee. *Bailey*, 106 F.3d at 144.

18

Kline has failed to "present evidence sufficient to create a genuine issue that her speech caused" Defendant to eliminate her position and not to rehire her. *Id.* (citations omitted). Accordingly, there is no genuine issue of material fact remaining as to Klines's First Amendment claims and the Defendant is entitled to judgment as a matter of law.

### V.  Wage Discrimination under O.R.C. 4112.02 *et seq.*

Kline has also alleged a claim for wage discrimination under Ohio law. Ohio Revised Code § 4112.02(A) provides that it is an unlawful discriminatory practice for any employer "because of the * * * sex * * * of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." The Ohio Supreme Court has held that "federal case law interpreting Title VII of the Civil Rights Act of 1964, Section 2000e et seq., Title 42, U.S.Code, is generally applicable to cases involving alleged violations of R.C. Chapter 4112." *Plumbers & Steamfitters Commt. v. Ohio Civil Rights Comm.* 66 Ohio St.2d 192, 421 N.E.2d 128, 131 (Ohio 1981).

Kline's burden here is to produce evidence that Defendant discriminated against her in terms of her salary because of her sex. *Birch v. Cuyahoga County Probate Court*, 392 F.3d 151, 164 (6th Cir. 2004) (*citing Conti v. Universal Enter., Inc.*, 50 Fed. Appx. 690, 698 (6th Cir. 2002)).  Kline may use "either direct evidence of discrimination or circumstantial evidence which would support an inference of discrimination." *Id.* (*citing Conti,* 50 Fed. Appx. at 699).

### 1.  DIRECT EVIDENCE

"Direct evidence is evidence which, if believed, proves the existence of improper discrimination animus without inference or presumption." *Id.* at 164-165 (internal quotation marks and citations omitted). "Evidence either of statements made by non-decision makers or of

statements made by decision-makers that are not related to the decisional process itself do not satisfy the plaintiff's burden of demonstrating direct evidence of discriminatory animus." *Id*. at 165 (citations omitted). "Instead, a plaintiff must show a direct correlation between the evidence of discrimination and the specific employment decision in question." *Id*. (citations omitted). Finding direct evidence of discrimination is rare. *Kline v. T.V.A.*, 128 F.3d 337, 348 (6th Cir. 1997); *but see, Laderach v. U-Haul of Northwest Ohio*, 207 F.3d 825, 829 (6th Cir. 2000) (finding direct evidence of discrimination from witness testimony that a supervisor stated he would not promote plaintiff because she was a woman and did not want her handling the "hot line" because "women were not mechanically inclined").

In support of her claim that she was paid less because she is female, Kline alleges that her male supervisor, Huff, told her that "bread winners" should make more money.  Doc. 43 at 21. Huff made this statement to Kline in 2005 or 2006 when he was making decisions regarding the amounts to give for raises within Water Resources.  According to Kline, she received a 2% raise at that time while the engineering supervisors who were all males, received "larger" raises. Doc. 43-21 and 22.

Huff's statement is not direct evidence. *See, e.g., Evans v. D.E. Foxx & Associates, Inc.*, 2013 WL 3867598, *3 (S.D.Ohio July 25, 2013).  In *Evans,* the court found that the employer's statements that he desired to recruit and retain white employees due to his belief that large customers preferred dealing with white employees and the employer's refusal to permit an African–American regional manager to participate in a presentation to Procter and Gamble due to the regional manager's lack of articulation were not direct evidence of racial discrimination. *Id*. Instead, the court found that the statements "require[d] an inference to be made before a conclusion of racial discrimination could be reached." *Id*.  Similarly, the only way the Court can

find improper discrimination based on Huff's statement is to *infer* or *presume* that he meant males when he said "bread winners."

Furthermore, "[i]solated and ambiguous comments are insufficient to support a finding of direct discrimination."  *White v. Columbus Metropolitan Housing Auth.*, 429 F.3d 232, 239 (6th Cir. 2005) (*citing Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1025 (6th Cir.1993)); *and see Pertz v. Edward J. DeBartolo Corp.* (6th Cir. 1999) 188 F.3d 508 (finding no direct evidence of age discrimination because statement about hiring "younger blood" was isolated and ambiguous). Kline has not produced any evidence that she would have received more than a 2% raise had she been a man.  She produced no evidence that the male engineering supervisors received more than 2% raises, only her opinion that their raises were "larger" than she received. Although this Court must view the facts in favor of Kline, this assertion requires the court to *infer* that the men received raises higher than 2%, instead of simply a higher dollar amount correlating to a 2% salary increase.[3]  Moreover, this statement by Huff was made in 2005 or 2006, over five years before Kline brought this suit.

Even if the comment is evidence of discriminatory intent, it fails to constitute direct proof of sex discrimination because "[t]he critical inquiry [in a sex discrimination case] is whether gender was a factor in the employment decision at the moment it was made." *White*, 429 F.3d at 239 (*citing Price Waterhouse v. Hopkins*, 490 U.S. 228, 241 (1989)). Kline has not established any link between this comment and the decision to give her a 2% raise.[4] As such, the statement is not direct evidence of sex discrimination against Kline.

---

[3] Kline's brief incorrectly argues that she testified that the male engineers received "a 2% raise while [she] worked on a department payroll." 48 at 14 citing Doc. 43 at 21-22.  In fact, Kline clearly states that she received a 2% pay raise in 2005 or 2006 and does not recall what the engineers received, but believed it was "larger." Doc. 43 at 21-22.
[4] Kline has asserted no direct evidence that Defendant paid her less because she is a female. The "bread winner" comment by Huff only relates to the issue of a raise in 2005 or 2006 and not Kline's salary in general.

Kline argues that this Court should consider Huff's statement along with his history of sexual harassment against female employees.  Because the sexual harassment allegations are "entirely divorced" from Defendant's decision to pay Kline a certain salary, "they cannot constitute direct evidence of sex discrimination with respect to [Kline's] claim."  *White,* 429 F.3d at 239, FN2.

Finally, Kline argues that Huff made clear that women accountants could not tell male engineers what they could build or spend money on. Doc. 48 at 15.  This argument is not supported by Kline in her brief, however during her deposition she discussed a time when she did not approve funding on a project and then engineers built it anyway.  Allegedly, Huff stated to her that "he would never have a woman telling the guys, the engineers, that they couldn't build something" despite the policy that nothing was to be built without her signing off that funds were available.  Doc. 43 at 78-79.  Even if this statement is true, it is not "direct evidence" that Kline was paid less because she is female.  Kline has shown no direct correlation between Huff's comment and her wage.  *See Birch*, 392 F.3d at 169.

### 2.  CIRCUMSTANTIAL EVIDENCE

Kline does not present an argument that this Court should analyze her wage discrimination claim using circumstantial evidence and relies solely on her argument for direct evidence of discrimination, stating that:

> It is ridiculous for Defendant to compare [Kline's] pay and other females pay to what men were paid at the Water Resources Department or the entire County Commissioner Board because it does not matter what those numbers are when it is admitted the male breadwinners will be paid more by the guy who signs off on the budget, Harold Huff.

Doc. 48 at 15.  However, having reviewed the record in its entirety, in the interest of being thorough, this Court chooses to analyze Kline's claim under the standards for both direct evidence and circumstantial evidence.

In order to survive summary judgment on a claim of sex discrimination using circumstantial evidence, the plaintiff must produce evidence sufficient to meet her prima facie burden under the four-prong test initially developed in *McDonnell Douglas. Id.* at 238 (citation omitted). "A plaintiff establishes a prima facie case of sex discrimination under Title VII by proving that (1) she is a member of a protected class; (2) that an adverse employment action was taken against her; (3) that she was qualified for the position; and (4) that a comparable non-protected person was treated better."  *Brune and Ashing v. Basf Corp.*, 234 F.3d 1267, *2 (6th Cir. 2000) (*citing Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582-83 (6th Cir. 1992)). "After a plaintiff creates a presumption of discrimination by stating a prima facie case, a defendant may rebut the presumption by proffering a legitimate, nondiscriminatory reason for its decision." *Id.* (*citing Kocsis v. Multi-Care Management, Inc.,* 97 F.3d 876, 883 (6th Cir. 1996)). "Once the defendant has put forth such a reason, the plaintiff must show that the defendant's proffered reason is pretextual." *Id.* (*citing McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-804 (1973) and *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 510-11 (1993)).

As a female, Kline is a member of a protected class.  There is also no dispute that she was qualified for her position.  The disputes lie with whether an adverse employment action was taken against her and whether men were treated better than she.

Kline argues that she was paid less than men who were similarly situated to her. Analysis for claims of wage discrimination—or unequal pay for equal work—is essentially the same whether claimed under the ADEA, Title VII, the Equal Pay Act, or Ohio law. *Mitchell v. Toledo*

*Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992); *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 437 (6th Cir. 1988); *Hickerson v. Armour Food*, 1992 WL 391165, *3 (W.D.Ky. July 17, 1992); *Plumbers & Steamfitters Joint Apprenticeship Committee v. Ohio Civil Rights Committee*, 66 Ohio St.2d 192, 197. To establish a prima facie case of unequal pay for equal work on the basis of gender, Kline must show that Defendant pays different wages to employees of the opposite sex "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Equal Opportunity Commission v. Romeo Community Schools*, 976 F.2d 985, 987 (6th Cir. 1992) (*quoting Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974)); *Kroh v. Continental Gen. Tire, Inc.*, 1999 WL 1215167, * 2 (Ohio App. Dec. 15, 1999). The phrase "equal work" does not mean identical jobs. *Odomes v. Nucare, Inc.*, 653 F.2d 246, 250 (6th Cir. 1981). Rather, to effectuate the remedial purpose of wage discrimination statutes, an employee need only show substantial equality between their job and a higher paid co-worker's job. *Id.*

Whether two jobs are substantially equal must be determined on a case-by-case basis. *Id.* Case-by-case analysis involves an overall comparison of the work, not the work in its individual segments. *Id.* Moreover, in comparing jobs, the jobs and not the employees are compared. *Equal Opportunity Commission v. City Council of the City of Cleveland*, 1989 WL 54252, * 4 (6th Cir. 1989). "[O]nly the skills actually required by the comparable jobs, not the abilities of the persons currently in those position[s] ..., must form the basis for comparison." *Id.* Further, "[a]pplication of the equal pay standard is not dependent on job classifications or titles but depends rather on actual job requirements and performance," since "[j]ob titles are frequently of such a general nature as to provide very little guidance in determining the application of the equal pay standard." 29 C.F.R. § 1620.13(e). Thus, it is "[j]ob content" that is "controlling." *Id.*

24

Similar to the plaintiff in *Follas v. Bagley*, Kline "has not described what she does at work on a day-to-day basis or what skills are involved in the execution of her job responsibilities; similarly, she has left unspoken what members of the comparison groups do in their employment." *Follas v. Bagley*, 2000 WL 251658, at *4 (N.D.Ohio Feb. 10, 2000).

Kline believes that she was paid less than the male engineering supervisors. Doc. 43 at 34. At the time her job was abolished, Kline received $26.61 per hour, equating to an annual salary of $54,142.40. Kline was paid at a pay grade commensurate with her role as accounting supervisor; she believed was the only person paid on this pay grade as it was specifically carved out for her with her qualifications. Doc. 43 at 31. The equivalent pay grade for comparison is the management level 5 pay grade; Kline was paid for her position of accounting supervisor at a management level 5 pay grade.

A review of the salaries for the employees at Kline's level of employment shows that two men were, in fact, paid higher than she was. Defendant presented undisputed evidence that four men working at the management level 5 pay grade currently make less than Kline made in 2011. Don Macko is currently paid at $24.28 per hour. Don Van Metre makes $25.58 per hour. Don West makes $25.68 per hour. James Akerley makes $23.72 per hour. The project engineers at Water Resources, who are also in the management level 5 pay grade, also made less than Kline. Of the six individuals Kline identified in her discovery responses as making more than she did for substantially equivalent work, only two – Kenneth Ricks and David Sloan – were paid at the management level 5 pay grade. In 2007, Mr. Ricks made $26.55 per hour at the time of his retirement in 2008. Mr. Ricks had worked for Defendant for 29 years at the time of his retirement, compared to Kline's then six years. In 2008, Mr. Sloan replaced Mr. Ricks as the

construction engineer. Defendant hired Mr. Sloan in at $25.48 per hour. At the time Kline's position was abolished, Mr. Sloan made $26.76 per hour - $0.73 more per hour than Kline.

The undisputed evidence shows that the position of a construction engineer, while at the same pay grade, is distinctly different from Kline's role as an accounting supervisor. Kline supervised two individuals within Water Resources, prepared the annual budget and the yearly projections, assisted with the state audits, and other accounting tasks as assigned. Doc. 43 at 38 - 42. "The construction engineer is responsible for supervising twice the amount of people for whom the accounting supervisor was responsible. Further, the construction supervisor is responsible for overseeing all of the outside construction work on the water and sewer lines in the County." Doc. 37 at 18 citing 18-2 (Affidavit of Lonzrick).  Thus, Kline has failed to adduce any proof of substantial equality, a necessary element of her prima facie case.

Assuming, *arguendo*, that Kline has met her burden to show that she was paid less than her male co-workers for equivalent work, the burden shifts to Defendant to show that her pay was not based on her gender.

The Supreme Court has determined that Title VII incorporates the four affirmative defenses of the Equal Pay Act. *County of Washington v. Gunther*, 452 U.S. 161, 192 (1981). These defenses are: (1) a seniority system; (2) a merit system; (3) a system that measures earnings by quantity or quality of production; or (4) any factor other than sex.  *Vehar v. Cole Nat. Group, Inc.*, 251 Fed.Appx. 993, 1000 (6th Cir. 2007) (citations omitted).  Defendant argues that Kline cannot prove discrimination because her pay was determined by her job classification and not her gender.  Kline has not disputed Defendant's evidence that she made more money than the majority of other employees in the same pay classification as she received. Nor has Kline shown that the reasons for Defendant paying her, at most, $0.73 less per hour than the

26

construction engineer supervisor was merely pretextual.  This Court agrees that the differences between Kline's job and the jobs of Mr. Ricks and Mr. Sloan "are a legitimate basis outside of gender for the minor pay differential between [Kline] and the position of construction engineer." Doc. 37 at 18.

For the above stated reasons, Kline has failed to show either by direct or circumstantial evidence that she was paid less by Defendant because of her gender.  Accordingly, Kline's claim for wage discrimination pursuant to O.R.C. 4112.02 is dismissed.

## VI. Conclusion

For the reasons set forth herein, the Defendant's motion for summary judgment is GRANTED.

IT IS SO ORDERED.

DATE: March 17, 2014                     */s/ John R. Adams*_____
                                          Judge John R. Adams
                                          UNITED STATES DISTRICT COURT